UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LOLA KRUGEL, | ) | CV 06-5116 SVW (PLAx) |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## I. INTRODUCTION

On July 21 and 22, 2009, the Court held a bench trial in Plaintiff Lola Krugel's suit brought under the Federal Tort Claims Act ("FTCA"). Plaintiff alleged that prison officials at the Federal Corrections Institution in Phoenix, Arizona ("FCI-Phoenix"), were negligent in determining that David Jennings, the man who murdered Plaintiff's husband Earl Krugel, was not a candidate for validation as a member of the Aryan Brotherhood. The Court now makes the following findings of fact and conclusions of law and enters judgment in favor of Defendant.

**II.   APPLICABLE LAW**

Under the Federal Tort Claims Act, federal district courts apply the substantive state law from the state where the incident occurred. See 28 U.S.C. § 1346(b).  Here, both the investigation of Jennings's gang affiliation and Earl Krugel's murder occurred in Arizona.

Under Arizona law, in order to prove negligence, the plaintiff must prove the following elements by a preponderance of the evidence:

> (1) The defendant had a duty, or obligation recognized by law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
>
> (2) The defendant failed to conform to the standard required;
>
> (3) There was a reasonably close causal connection between the conduct and the resulting injury; and
>
> (4) There was actual loss or damage.

Ontiveros v. Borak, 136 Ariz. 500, 504 (1983).  The same elements apply in wrongful death actions.  See Taylor v. Di Roco, 124 Ariz. 513, 517 (1980).

**III.  ANALYSIS**

The Court finds that Plaintiff has not sustained its burden of proving by a preponderance of the evidence that the prison officers at FCI-Phoenix were negligent in determining that Jennings (1) did not admit to membership in the Aryan Brotherhood and (2) did not have Aryan Brotherhood-specific tattoos.  As a result, the prison officials were

2

not negligent in deciding that Jennings was not a candidate for validation as a member of the Aryan Brotherhood.

    Plaintiff's first witness was Officer Bond, the prison officer who conducted the initial screening interview of Jennings at FCI-Phoenix on July 2, 2004. Officer Bond's testimony was of minimal importance because, to the extent that Officer Bond made any errors during the initial screening interview of Jennings, these errors were subsequently cured by Officer Feeney's thorough investigation of Jennings. Officer Bond photographed and physically examined Jennings's tattoos and determined that none of his tattoos were specific to the Aryan Brotherhood. Officer Bond's photographs did not focus on the tattoo located on Jennings's left bicep, although Officer Bond testified that he viewed all of Jennings's tattoos. As discussed further below, the Court finds that Officer Bond's evaluation of Jennings's tattoos was accurate.

    The Court finds that Officer Feeney was not negligent in conducting his investigation to determine Jennings's gang affiliation. As a general matter, the Court finds Officer Feeney's testimony to be credible and the Court fully credits his testimony.

    Officer Feeney performed an inspection of Jennings's entire body when Jennings was housed in the Special Housing Unit ("SHU") in early April 2005. When conducting this inspection, Officer Feeney closely examined Jennings's body and inspected Jennings's tattoos. Officer Feeney inspected the tattoos from a distance of two feet to six inches. Officer Feeney took special note of the tattoo on Jennings's left bicep because Officer Feeney thought that it depicted a skull and that it bore some resemblance to a tattoo used by the Arizona New Mexican

Mafia.  Officer Feeney was concerned that the Mexican inmates might harm Jennings if they noticed the tattoo.  Having examined the tattoo while Jennings was in the SHU, Officer Feeney did not believe that the tattoo on Jennings's left arm was specific to the Aryan Brotherhood.

Officer Feeney analyzed the Validation Worksheet filled out by Officer Bond with respect to Jennings.  Officer Feeney inspected the photographs taken by Officer Bond during the intake interview.  Officer Feeney made a handwritten alteration to the Validation Worksheet initially filled out by Officer Bond.  Officer Feeney changed Jennings's "Group Affiliation" from "Pecker Wood, Gypsy Jokers," to "Skinhead /o WSG [white supremacist group]."

Officer Feeney found that Jennings was a member of the Skinheads. Officer Feeney and Defendant's expert, Officer Danine Adams, another SIA with the Bureau of Prisons ("BOP"), both testified that an inmate cannot be a member of both the Skinheads and the Aryan Brotherhood at the same time.  Both witnesses testified that if an inmate becomes a member of the Aryan Brotherhood, he must renounce all connection to other gangs, including the Skinheads.  The Court credits their testimony in this regard.

Plaintiff has not proven that Officer Feeney's finding that Jennings was a member of the Skinheads was incorrect.  While in the SHU, Jennings had in his possession a tattoo stencil containing the word "Skinhead."  Officer Feeney testified that only members of the Skinheads gang could possess such a tattoo stencil.  Officer Feeney also testified that it was the prison's custom and practice to take only those items belonging to the specific inmate to the SHU. Plaintiff's argument that the stencil could have belonged to Jennings's

4

1  cellmate is not persuasive.  Plaintiff has not offered the testimony,
2  for example, of the prison official to collected Jennings's items, who
3  could have testified in Plaintiff's favor that the tattoo stencil
4  belonged to Jennings's cellmate.

**REDACTED - UNDER SEAL**

Jennings also admitted to Officer Feeney that he was a member of the Skinheads.

Officer Feeney spoke with Jennings on a weekly basis in order to investigate Jennings's gang affiliation.  Officer Feeney also monitored Jennings's phone calls and the mail that Jennings sent and received while in prison.  Officer Feeney found that Jennings was not communicating with members or associates of the Aryan Brotherhood. Officer Feeney also viewed Jennings's group photographs, and found that Jennings was not taking pictures of Aryan Brotherhood associates or members.

Officer Feeney regularly spoke with a prison informant who had been associated with the Aryan Brotherhood.  That informant never informed Officer Feeney that Jennings had any affiliation with the Aryan Brotherhood.  Officer Feeney testified that this was the type of information that the informant would have provided.

Even if Officer Feeney had investigated further into the prison Sentry database and seen the other notations from other employees of the BOP indicating that Jennings may have had Aryan Brotherhood tattoos, this would not have changed the outcome of Officer Feeney's investigation.  Officer Feeney would not have relied solely on the

1   notations in exhibits 65, 81, and 127 in order to determine whether
2   Jennings had Aryan Brotherhood-specific tattoos, because Officer Feeney
3   had an independent ability and duty to evaluate Jennings's gang
4   affiliation.  Furthermore, Jennings could not be sure of the
5   qualifications of the other employees with respect to identifying gang-
6   specific tattoos, especially in light of Officer Feeney's knowledge and
7   experience that the individuals who performed these intake interviews
8   were not gang experts.  Officer Feeney had considerable experience in
9   identifying symbols and tattoos that were specifically associated with
10  gangs in federal prison.

11       Even if Officer Feeney had followed up with other BOP employees in
12  Oklahoma or Salt Lake City regarding their notations that Jennings had
13  Aryan Brotherhood tattoos, the Court finds Officer Feeney's testimony
14  credible that he would have reached the same result, and found that
15  Jennings's tattoos were not specific to the Aryan Brotherhood.

16       Program Statement 1380.03 also states
17                          **REDACTED - UNDER SEAL**
18    **REDACTED - UNDER SEAL**     The notations from other employees in the
19  federal prison system on exhibit 65 were not sufficiently credible to
20  have been considered an "admission" by Jennings for the purposes of
21  inclusion on the Validation Worksheet.  First, it is unclear who wrote
22  the words "Ary-Bro" on exhibit 65.  Because the handwriting with
23  respect to the notation "Ary-Bro" is distinctly different from the
24  handwriting on other locations of exhibit 65, it is questionable that
25  "Ary-Bro" was even on the form when Jennings signed it.  Furthermore,
26  it is doubtful that, by signing the form, Jennings was attesting to the
27  accuracy of the "Ary-Bro" comment.  It is at the most equally likely,
28

6

if not more likely, that Jennings was simply attesting to the fact that Jennings had received the required BOP booklet. Thus, even if Officer Feeney had seen exhibit 65, it alone would not have been sufficient to qualify as an admission for the purposes of the Validation Worksheet.

Plaintiff have not met their burden of proof that by signing exhibit 65, Jennings was admitting to membership in the Aryan Brotherhood. Plaintiff could have produced the BOP employee "M. Korstjens," who performed the interview of Jennings. This employee could have testified with regard to whether the "Ary-Bro" notation on the form was there when Jennings signed the form. This employee could have further testified as to whether Jennings admitted to membership in the Aryan Brotherhood, or whether the notation was the result of the interviewer's independent evaluation. Plaintiff, however, has not produced any such evidence, and as a result, has not satisfied her burden of proving that Jennings actually admitted to membership in the Aryan Brotherhood.

Officer Feeney testified that if he had seen exhibits 65, 81, or 127 before Krugel's murder, Officer Feeney would have expressly asked Jennings whether Jennings was a member of the Aryan Brotherhood. Even if Officer Feeney had asked Jennings this explicit question, however, Plaintiff has not sustained its burden of proving that Jennings would have admitted to membership in the Aryan Brotherhood. In fact, Jennings denied membership in the Aryan Brotherhood after the murder when Officer Feeney expressly asked Jennings whether he was a member of the Aryan Brotherhood. Plaintiff never noticed Jennings for a deposition, nor subpoenaed Jennings for trial. While Plaintiff's

counsel told the Court that Jennings's lawyer said Jennings would not testify, no effort was made to compel his testimony.

Furthermore, although Officer Feeney did not see the Security Designation form (exhibit 127), which stated that Jennings needed SIA review, the Court finds that Officer Feeney performed a thorough and adequate review of Jennings. The Security Designation form states that Jennings needed SIA review. Even if Officer Feeney had performed a more formalized "SIA review," rather than the ongoing review of Jennings's gang affiliation that Officer Feeney actually performed, Plaintiff has not demonstrated by a preponderance of the evidence that the outcome of the review would have been different.[1] As discussed above, Officer Feeney personally inspected Jennings's tattoos, spoke with Jennings on a weekly basis, monitored his phone calls and mail, and investigated Jennings's affiliation with other prison inmates. The Court finds Officer Feeney performed a thorough and adequate review of Jennings, and that, even if Officer Feeney had conducted an "SIA review," the result of the investigation would have been the same.

Plaintiff offers the testimony of its expert Earl Sullivan. The Court finds that Mr. Sullivan's testimony is generally unreliable. Due to Mr. Sullivan's general lack of foundation with respect to most matters upon which Mr. Sullivan opines, the Court gives his testimony very little weight. Mr. Sullivan has been an expert witness for approximately the last fifteen years. Plaintiff has not presented

---

[1] Plaintiff has also not presented any evidence that the review conducted by Officer Feeney was not the kind of SIA review that the BOP employee had in mind when he or she made the entry into the Sentry database. Plaintiff did not present evidence, for example, from the BOP employee who made the notation, who could have testified as to what he or she meant by an "SIA review."

sufficient evidence to persuade the Court that Mr. Sullivan has taken the necessary steps to keep current during the past fifteen years with methodologies for identifying prison gangs in federal prisons. Even when Mr. Sullivan was working in the prison system, his work was confined primarily to state prisons, not federal prisons such as FCI-Phoenix. Mr. Sullivan's experience in the prison system was primarily with respect to prison administration; his regular duties did not include the identification of prison gangs. Mr. Sullivan's experience in identifying prison gangs is primarily anecdotal and stems from the few audits he performed at San Quentin and in the Illinois prison system in the early to mid-1980's. Even when he was performing the audits of those prisons, however, his primary focus was not on identifying or classifying prison gangs. Indeed, Mr. Sullivan admitted that the topic of prison gangs was merely an issue that came up in passing while conducting the audits.

Mr. Sullivan also testified that the basis for some of his opinions was a book called "Gangs Across America," by Luis Savelli. The Court has analyzed this source and finds that it is unpersuasive regarding the issues at trial. The author, Mr. Savelli, has not described his qualifications in identifying gangs in federal prison; it appears that Mr. Savelli's experience with gangs comes primarily from his experience as a police officer with the New York City Police Department. There is nothing that would allow the Court to take judicial notice of this book as a recognized authority in the field.

**REDACTED - UNDER SEAL**

**REDACTED - UNDER SEAL**

Because of Mr. Sullivan's minimal experience in the realm of identifying gang tattoos on federal prison inmates, the Court gives Mr. Sullivan's opinions very little weight.

Furthermore, the Court finds that Mr. Sullivan's testimony generally lacks credibility. The Court independently observed Mr. Sullivan while testifying on the stand and finds that he is generally not credible. In the Court's view, Mr. Sullivan is a professional witness who is attempting to use his general experience as a state prison official in order to present himself as an expert on these more specialized issues, for which Mr. Sullivan generally lacks foundation.

Mr. Sullivan testified that the tattoo on Jennings's left bicep was, in his opinion, an Aryan Brotherhood tattoo. Mr. Sullivan testified that the tattoo on Jennings's left bicep was a disguised shamrock, and that near the top of the tattoo it contained tiny "A's" and "B's," which are associated with the Aryan Brotherhood. Mr. Sullivan testified that he needed to use a magnifying glass and a lamp in order to identify certain marks on the skull tattoo as "A's" and "B's." Officer Feeney and Officer Adams testified that the same markings were spikes or horns. The Court closely inspected the tattoo on Jennings's left bicep, however, and does not see any "A's" or "B's." Instead, the Court agrees with Officer Feeney and Officer Adams, that the markings resemble spikes or horns protruding from the head of the skull.

Plaintiff magnified the picture using the projector in the courtroom, but even then, the Court did not see any "A's" and "B's." The Court generally finds Mr. Sullivan's testimony with respect to the purported "A's" and "B's" not credible. The Court finds it highly unlikely that any further magnification would have made the purported "A's" and "B's" visible. Even if Mr. Sullivan did see "A's" and "B's" when applying greater magnification, that magnification was not reproduced for the Court at trial. Thus, Plaintiff has not sustained her burden.

To the extent that Mr. Sullivan disagrees with the BOP's decision to identify certain tattoos with the Aryan Brotherhood, but not others, Mr. Sullivan's opinion is without foundation.

In some ways, Mr. Sullivan's testimony with regard to the purported "A's" and "B's" on the tattoos actually supports a finding that Officer Feeney was not negligent in concluding that Jennings did not have Aryan Brotherhood-specific tattoos. In light of the fact that Mr. Sullivan had to use such specialized magnification and lighting to discover these purported "A's" and "B's," Officer Feeney's physical inspection was not negligent. Plaintiff has not presented any evidence that the standard of care under the circumstances required Officer Feeney to use a magnifying glass and lamp in order to inspect each and every tattoo to determine whether Jennings had an Aryan Brotherhood tattoo.

Plaintiff argues that part of the reason for the inability to see the purported "A's" and "B's" on Jennings's left bicep is because Defendant provided Plaintiff with poor quality photographs. The Court, however, finds that the quality of the photographs is not an issue, and

1  that the photographs are of very good quality.[2]  If Plaintiff had wanted
2  to obtain even better quality photographs of Jennings's tattoo,
3  however, there was nothing preventing Plaintiff from performing a
4  physical inspection of Jennings pursuant to Rule 35 of the Federal
5  Rules of Civil Procedure and taking additional photographs.
6      Furthermore, the Court rejects Mr. Sullivan's conclusion that the
7  tattoo on Jennings's left bicep resembles a shamrock.  Officers Feeney
8  and Adams testified that the tattoo on Jennings's left bicep resembles
9  a skull with spikes or horns protruding from the top of the skull.
10 Based on the Court's own assessment of the tattoo, the Court finds the
11 testimony of Officers Feeney and Adams to be a more accurate
12 description of the tattoo on Jennings's left bicep.  Mr. Sullivan's
13 interpretation that the tattoo resembles a disguised shamrock is simply
14 unsupported.

**REDACTED - UNDER SEAL**

---

[2] The photos produced at trial were of much better quality than the photographs produced in connection with Defendant's Motion to Dismiss.

**REDACTED - UNDER SEAL**, the Court finds that Officer Feeney and Officer Bond were not negligent in their determination that Jennings did not have Aryan Brotherhood tattoos. The Court also rejects Plaintiff's argument that the tattoo on Jennings's left bicep was a "disguised" shamrock. The Court has closely inspected the tattoo in question, and finds that it is not a disguised shamrock.

Plaintiff's claim also fails because Plaintiff has not proven by a preponderance of the evidence that, but for the prison officers' negligence, Jennings would have been validated as a member of the Aryan Brotherhood, and therefore, been placed in a maximum security prison. First, even if Officers Feeney and Bond had been negligent with respect to whether Jennings admitted to membership in the Aryan Brotherhood, this would have been worth only five points. Ten points are required in order to become a candidate for further validation procedures. In light of the Court's finding with respect to the tattoos, Jennings would not have received more than ten points, and thus, even if Jennings had admitted to membership in the Aryan Brotherhood, Jennings would not have been a candidate for further validation procedures.

Plaintiff did not prove by a preponderance of the evidence that if Jennings had been specifically asked about his membership in the Aryan Brotherhood, that Jennings would have admitted to such membership. As discussed above, the intake form from Oklahoma City is inconclusive with regard with whether Jennings admitted to membership. The evidence reveals that, if asked, Jennings would have denied membership in the Aryan Brotherhood. Indeed, when asked about his membership after the murder, Jennings denied that he was a member of the Aryan Brotherhood. Jennings is currently housed in the maximum security prison in

Florence, Colorado, **REDACTED - UNDER SEAL**

**REDACTED - UNDER SEAL** to this day, he has not been validated as a member of the Aryan Brotherhood.

Plaintiff also has not sustained its burden of proving that if Jennings had been proposed for further validation procedures, that the relevant BOP officials would have validated Jennings as a member of the Aryan Brotherhood. Officers Feeney and Adams both testified that even if Jennings had been proposed for further validation procedures, that Jennings would not have been validated. Officer Feeney and Officer Adams have personal knowledge regarding the validation procedures. Indeed, Officer Feeney testified that he had been involved in validating other inmates for membership in disruptive groups. Officer Adams is currently an SIA at Fort Dix, in New Jersey, and before this current assignment, she was the Chief of the BOP's Sacramento Intelligence Unit. Officer Adams has also worked in the BOP offices in Washington D.C., during which time she was instrumental in formulating the BOP's national gang investigator training program. Officer Adams has extensive experience with the Aryan Brotherhood in federal prisons because she worked from 1997 to 2000 as an intelligence monitor in

**REDACTED - UNDER SEAL**

**REDACTED - UNDER SEAL** Officer Adams learned directly from the Aryan Brotherhood members in **REDACTED - UNDER SEAL** which symbols the Aryan Brotherhood used. Officer Adams has testified as an expert witness on at least three occasions in federal court with respect to the Aryan Brotherhood.[3] Officer Adams testified that she is personally familiar

---

[3] Mr. Sullivan had never before testified as to the Aryan Brotherhood in federal court.

with the BOP's validation procedures, and has used them in her various roles within the BOP.  Thus, the Court finds that both Officer Feeney and Officer Adams have personal knowledge of the BOP's validation procedures and the finds their testimony credible.

Mr. Sullivan states that Jennings should have been validated as a member of the Aryan Brotherhood if he had been proposed for validation. Mr. Sullivan lacks any foundation, however, to make such a statement, as he is not personally familiar with the BOP's validation procedures. Program Statement 1380.03 states that

**REDACTED - UNDER SEAL**

It is only if an inmate is a validated member of the Aryan Brotherhood that the inmate must be housed at a maximum security prison.  Thus, the fact that in Mr. Sullivan personally believes that Jennings was a member of the Aryan Brotherhood is largely irrelevant; the necessary inquiry is whether the BOP would have validated Jennings for membership in the Aryan Brotherhood.  Mr. Sullivan has no foundation to opine on these matters given his lack of experience in the BOP and lack of familiarity with the BOP's validation procedures.  Instead, the Court accepts the testimony of both Officers Feeney and Adams, who unequivocally testified that Jennings would not have been validated as a member of the Aryan Brotherhood.

Plaintiff also points to the Symbols Manual, which states that

**REDACTED - UNDER SEAL**

**REDACTED - UNDER SEAL** Plaintiff, however, misinterprets the Symbols Manual. While the Symbols Manual does note that

**REDACTED - UNDER SEAL**

The Program Statement says that in order for a tattoo to be considered, the tattoo must be "STG-specific." Thus, the Manual makes clear that for the purposes of identifying an inmate as a member of the Aryan Brotherhood,

**REDACTED - UNDER SEAL**

The testimony of Officers Feeney and Adams, who have personal knowledge of these validation procedures, was consistent with this interpretation.

Thus, the Court finds that Mr. Sullivan's opinion is entitled to very little weight with regard to whether Jennings would have ultimately been validated as a member of the Aryan Brotherhood. Instead, the Court accepts in full the testimony of Officers Feeney and Adams, both of whom testified that Jennings would not have been validated as a member of the Aryan Brotherhood. Thus, the Court finds that Plaintiff has not sustained her burden of proving that, but for any alleged negligence on the part of the officers, Jennings would have been validated as a member of the Aryan Brotherhood and would have been placed in a maximum security prison.

**IV. CONCLUSION**

For the reasons stated above, the Court finds that Plaintiff has not sustained her burden of proving by a preponderance of the evidence

that the officers of FCI-Phoenix were negligent in concluding that Jennings did not admit to membership in the Aryan Brotherhood and did not have Aryan Brotherhood-specific tattoos.  Furthermore, Plaintiff has not proven that, but for this alleged negligence, Jennings would have been validated as a member of the Aryan Brotherhood and would have been placed in a maximum security prison, where Jennings would have been unable to harm Earl Krugel.

    The Court recognizes that the murder of Earl Krugel was a sad and tragic event.  The Court empathizes with Plaintiff, who has suffered an unfortunate loss.  When considering the applicable law and the evidence presented at trial, however, Plaintiff cannot prevail on her claim.  As a result, the Court enters judgment in favor of Defendant.

    IT IS SO ORDERED.

DATED:   July 23, 2009

                                    STEPHEN V. WILSON
                             UNITED STATES DISTRICT JUDGE